IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| ASICS AMERICA CORPORATION, | ) | |
| | ) | |
| Plaintiff/Counterclaim Defendant, | ) ) | |
| | ) | |
| v. | ) | 1:09CV135 |
| | ) | |
| AKEVA L.L.C., | ) | |
| | ) | |
| Defendant/Counterclaim Plaintiff, | ) ) | |
| | ) | |
| v. | ) | |
| | ) | |
| NIKE, INC.; ADIDAS AMERICA, INC.; NEW BALANCE ATHLETIC SHOE, INC.; and PUMA NORTH AMERICA, INC., | ) ) ) ) | |
| | ) | |
| Third Party Defendants. | ) | |

MEMORANDUM OPINION, ORDER, AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE

This case involves the alleged infringement of certain of Akeva L.L.C.'s patents related

to the heels of athletic shoes. The matter came before the Court for a claim construction

hearing and for a hearing on a Motion for Summary Judgment of Non-Infringement or

Invalidity. The Court stayed the case to allow for further mediation and settlement

discussions, and to allow for filing of supplemental briefing following the hearing. The stay

was extended to allow for finalizing of settlement. Most of the claims have now been settled,

and the only claims remaining are the third party claims between Akeva as Counterclaim Plaintiff and Nike, Inc. and adidas America, Inc. as Counterclaim Defendants. For the reasons that follow, the Court will recommend construction of the disputed claim term "rear sole secured" in the '126 patent, and will then recommend that Counterclaim Defendants' Motion for Summary Judgment [Doc. #298, #304] be granted and that this action be dismissed.

I.     BACKGROUND

This action was originally filed by Asics America Corporation against Akeva seeking a declaratory judgment that its athletic shoes did not infringe ten patents belonging to Akeva, and also seeking a declaratory judgment that these Akeva patents are invalid. Akeva then counterclaimed for patent infringement against Asics, and added patent infringement claims against Nike, Adidas, New Balance Athletic Shoe, Inc., and Puma North America, Inc. These newly-added parties then counterclaimed against Akeva seeking a declaration of non-infringement of the Akeva patents and a declaration of invalidity of these patents. Following discovery, the Parties narrowed their claims to five asserted Akeva patents: the '126 patent, the '269 patent, the '130 patent, the '350 patent, and the '099 patent. As noted above, many of the parties have settled, and the only claims remaining are Akeva's claims of patent infringement against Nike and Adidas and the corresponding claim by Nike and Adidas for declaratory judgment of non-infringement and invalidity of Akeva's patents. The primary dispute in this case is whether Akeva's patents cover shoes with conventional heels

(permanently fixed in position) or whether the patents cover only shoes with a heel that is detachable or that rotates. In an earlier action in this district (1:03CV1207), Akeva brought a patent infringement action against Adidas alleging infringement of another, related patent. In that case, the Court construed two Akeva patents (the '300 and '471 patents) to cover only shoes with rotatable or detachable rear soles. <u>Akeva L.L.C. v. adidas America, Inc.</u>, No. 1:03CV1207, 2005 WL 6225278 (M.D.N.C. May 17, 2005), as supplemented, 365 F. Supp. 559 (M.D.N.C. 2005). In that case, the Court described the dispute as follows:

> [T]he patent discloses a rear sole "secured" below the heel region of the shoe. The heel region incorporates a flexible plate that is supported at its periphery, has a void beneath its interior area, and is capable of deflection at its interior. Generally speaking, the flexible plate acts like a trampoline, cushioning the impact of the wearer's heel and providing extra spring. The '300 Patent claims several variations on this theme. Central to one of the disputes is a feature wherein the heel can be separated from the rest of the shoe by the wearer, allowing a new heel to be attached in its place. This allows the wearer to replace the heel when it becomes worn or when the wearer needs different cushioning and spring properties for a different activity, such as playing basketball rather than running. There is also a feature that allows the heel to be rotated by the wearer so that the fast-wearing, ground-engaging portion located at the very back of the heel is no longer ground-engaging, thereby giving the heel a longer life. The parties disagree whether the "spirit" of the invention should be the flexible plate, as Plaintiff contends, or the removability and rotatability of the heel, as Defendant argues.

<u>Id.</u> at *1. Following a claim construction hearing, the Court construed the '300 patent's claim terms' reference to a rear sole "secured" to mean "a rear sole selectively or permanently fastened, but not permanently fixed in position." <u>Id.</u>at *10. The Federal Circuit affirmed that decision on appeal. <u>Akeva L.L.C. v. adidas Am., Inc.</u>, 208 F. App'x 861 (Fed. Cir. 2006). Thus, shoes with a permanently attached, non-rotatable sole do not infringe the '300 patent.

All of the allegedly infringing shoes in that case had a conventional rear sole (not rotatable or detachable), so the determination that the '300 patent covered only soles that were not permanently fixed in position (i.e., only soles that were rotatable or detachable) meant that there was no infringement of the '300 patent.

The '300 patent in that prior suit is related to the five patents at issue in the present suit. In simplified terms, the '126 patent is a grandparent in that line, the '300 patent from the prior suit is a descendant of the '126 patent, and the remaining patents are, in turn, descendants of the '300 patent. Akeva contends that Nike and Adidas infringed the '126 patent and also infringed the later descendant patents (the '269 patent, the '130 patent, the '350 patent, and the '099 patent, referred to collectively as the "Continuation Patents").[1]

The Counterclaim Defendants previously moved to dismiss Akeva's claims based on collateral estoppel, in light of the determination as to the '300 patent in the prior case. However, the Court concluded that as to the '126 patent, claim construction was required. The Court noted that the claim construction of the '300 patent in the prior suit would not control the claim construction of the '126 patent as a matter of law, since context matters when construing claim terms, and the '300 patent was a later continuation-in-part of the '126 patent. In addition, with respect to the remaining patents, all of which are continuation

---

[1] Initially, the parties also raised claims related to a second family of patents, involving continuation patents of the '471 patent from the prior suit. However, Akeva has elected not to proceed with respect to those patents, so the only matters remaining involve the patents set out above related to the '300 patent. !

patents of the '300 patent, the Court concluded that there were issues beyond the scope of collateral estoppel, based on Akeva's contention that it had rescinded any disclaimers and specifically covered non-rotatable, non-detachable heels in the Continuation Patents. Those issues have now been fully briefed by the parties in the claim construction briefing and the Motion for Summary Judgment and supplemental briefing, and are further addressed below.

II.     DISCUSSION

    A.     Claim Construction

The Court's claim construction analysis is largely controlled by the Federal Circuit's decisions in <u>Markman v. Westview Instruments, Inc.</u>, 52 F.3d 967 (Fed. Cir. 1995), <u>aff'd</u>, 517 U.S. 370 (1996), and <u>Phillips v. AWH Corp.</u>, 415 F.3d 1303 (Fed. Cir. 2005). Under <u>Markman</u>, the Court must first determine the "meaning and scope of the patent claims asserted to be infringed." <u>Markman</u>, 52 F.3d at 976. Then, the Court must compare the properly construed claims to the product that is accused of infringing. <u>Id.</u> The first step is a matter of law and a decision for the court. The <u>Phillips</u> case holds that in construing the claim of a patent, the court should begin construing a claim term by considering the plain and ordinary meaning that a person skilled in the art would understand the term to have. "Importantly, the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." <u>Id.</u> at 1313.

Under Phillips, the Court begins with the claims themselves, which may provide "substantial guidance as to the meaning of particular claim terms. . . . To begin with, the context in which a term is used in the asserted claim can be highly instructive." Id. at 1314. In addition, "[o]ther claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment as to the meaning of a claim term. . . . Because claim terms are normally used consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims. Differences among claims can also be a useful guide in understanding the meaning of particular claim terms. . . . For example, the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." Id. at 1314-15.

However, "[t]he claims, of course, do not stand alone. Rather, they are part of 'a fully integrated written instrument,' consisting principally of a specification that concludes with the claims. For that reason, claims 'must be read in view of the specification, of which they are a part.'" Id. at 1315 (quoting Markman, 52 F.3d at 978-79). The Federal Circuit emphasized that "the specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." Phillips, 415 F.3d at 1315 (internal quotation omitted). "The importance of the specification in claim construction derives from its statutory role. . . . In light of the statutory directive that the inventor provide a "full" and "exact" description of the claimed invention, the specification

necessarily informs the proper construction of the claims." Id. "[T]he specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs. . . . In other cases, the specification may reveal an intentional disclaimer, or disavowal, of claim scope by the inventor. In that instance as well, the inventor has dictated the correct claim scope, and the inventor's intention, as expressed in the specification, is regarded as dispositive." Id. (citing SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc., 242 F.3d 1337, 1343–44 (Fed. Cir. 2001)).

Thus, "[c]laim language governs claim interpretation" but claim terms "are construed in light of the specification" and "[t]he ordinary meaning of a term may be narrowed when interpreted in light of the specification." Akeva, 208 F. App'x at 863. In undertaking claim construction, "courts should watch the often difficult line between construing the terms in light of the specification and importing limitations from the specification." Akeva, 365 F. Supp. at 563. "To avoid importing limitations from the specification into the claims, it is important to keep in mind that the purposes of the specification are to teach and enable those of skill in the art to make and use the invention and to provide a best mode for doing so." Phillips, 415 F.3d 1323. The Court must keep its focus on "understanding how a person of ordinary skill in the art would understand the claim terms." Id.

B.      General Description of the Asserted Patents

The '126 patent is the first in the line of the asserted patents and is dated October 1, 1996.  The remaining patents at issue are descendants of the '126 patent.  The '126 patent discloses "[a] shoe [that] includes a heel support for receiving a rotatable and replaceable rear sole to provide longer wear."  (Patent '126 [Doc. # 292-1] at 2 (Abstract).)  "The shoe may also include a graphite insert supported by the heel support between the heel and the rear sole to reduce midsole compression and provide additional spring."  (Id.)  Akeva contends that the scope of the patent includes shoes with a permanently attached and permanently fixed rear sole, as opposed to one that is detachable and/or rotatable.

The '300 patent from the prior suit is a continuation-in-part of that '126 patent.  As discussed above, the Federal Circuit found that the '300 patent "discloses athletic shoes with extended life by improving the rear sole such that the rear sole is rotatable, detachable, or both."  Akeva, 208 F. App'x at 864.  The Federal Circuit concluded that "one skilled in the art reading the specification of the '300 patent specification would understand the term 'secured' as used in the '300 patent to mean shoes with rear soles that are secured to the shoe, but not permanently fixed."  Id. at 865.

The remaining asserted patents are all continuation patents of the '300 patent.  The '269 patent is dated October 3, 2006.  It describes a shoe with "a flexible member positioned below at least a portion of the foot support region and above at least a portion of the sole."  (Patent '269 [Doc. # 292-2] at 2 (Abstract).)  "[T]he flexible member deflects in use in a

8

direction substantially perpendicular to a major longitudinal axis of the shoe," and thus acts like a trampoline.

The '130 patent has an issue date of November 22, 2005. It describes a "shoe including a plate capable of being deflected in a direction substantially perpendicular to the major longitudinal axis of the shoe." (Patent '130 [Doc. #292-5] at 2 (Abstract).) The plate "includes at least one rib integral with at least a portion of the lower surface of the plate" and a "portion of the rib is exposed to and visible from outside the shoe." (Id.)

The '350 patent has an issue date of June 3, 2008. It describes a shoe "having an open interior, a plate positioned between the bottom of the shoe and a portion of the upper, and at least one opening extending from the bottom of the shoe into the midsole for providing air communication with the interior of the upper." (Patent '350 [Doc. #292-3] at 2 (Abstract).)

Finally, the '099 patent has an issue date of June 2, 2009. It describes "[a] shoe including a heel support integrally formed of a material different from the midsole material of a rear sole for supporting the foot of a user." (Patent '099 [Doc. #292-4] at 2 (Abstract).) The heel support includes vertical walls that include "at least one window through which at least a portion of the midsole material of the rear sole is exposed to and visible from the outside of the shoe." (Id.)

C.    The '126 Patent's Disputed Claim Terms

The primary disputed claim term of the '126 patent is the term "rear sole secured" which appears in multiple claims, asserted here as to Claims 25, 27, and 31. Akeva argues that

the Court should give this term its plain and ordinary meaning or that it should be construed to mean "a structure including a midsole portion and a ground contacting outsole portion attached to the shoe." Defendants, on the other hand, argue that this term should be construed to mean a "rear sole selectively or permanently fastened, but not permanently fixed into position." The crux of this dispute is whether the claims should be construed to include a conventional permanently attached heel, or whether the claim only covers shoes with a detachable or rotatable heel.

In presenting these differing proposed constructions, the parties dispute at length the extent to which the Court's earlier construction of the '300 patent claim terms, and particularly for the term "secured," should influence or control the construction of the '126 patent claim terms. Defendants' construction of these claim terms follows the construction given to "secured" in the '300 patent litigation by the district court and the Federal Circuit. Akeva contends that because the prior construction was based on a different specification, the '126 claim terms should not be construed the same as the '300 claim term. Given this dispute, the Court first undertakes claim construction without reference to the prior action involving the '300 claim.

Claim 25 of the '126 patent is the first disputed claim. That claim describes a shoe having:

> an upper having a heel region;
> a rear sole secured below the heel region of the upper; and
> a flexible plate having upper and lower surfaces and supported between at least a
>     portion of the rear sole and at least a portion of the heel region of the upper,

peripheral edges of the plate being restrained from movement relative to an interior portion of the plate in a direction substantially perpendicular to a major axis of the shoe so that the interior portion of the plate is deflectable relative to the peripheral edges in a direction substantially perpendicular to the major axis of the shoe.

('126 patent [Doc. #292-1] at 30.)   Claim 27 incorporates the shoe of Claim 25, but "including a heel support having at least one wall extending downwardly from the upper to at least partially define a recess, the rear sole secured in the recess of the heel support."   (Id.)   Claim 31 incorporates the shoe of Claim 27, but "including a forward sole attached to the upper and an arch bridge integral with the heel support and adjacent the downwardly extending wall of the heel support, the arch bridge attached to the upper and extending between the heel support and the forward sole."   (Id. at 31.)   As set out above, in construing these claims, the Court must consider how a person skilled in the art would understand the terms when read in the context of the entire patent, including the specification.

The Abstract describes the invention as follows:

> A shoe includes a heel support for receiving a rotatable and replaceable rear sole to provide longer wear.   The shoe may *also* include a graphite insert supported by the heel support between the heel and the rear sole to reduce midsole compression and provide additional spring.

(Id. at 2) (emphasis added).   Thus, the description of the invention is a shoe with a rotatable/replaceable rear sole, and that shoe may *also* include a graphite insert for additional spring.

The Background of the Invention states that the invention "relates generally to an improved rear sole for footwear and, more particularly, to a rear sole for an athletic shoe with

11

an extended and more versatile life and better performance in terms of cushioning and spring."

(<u>Id.</u> at 23.) The specification notes that athletic shoes "typically include a laminated sole attached to a soft and pliable upper," and "[w]hen laminated, the sole is attached to the upper as a one-piece structure, with the rear sole being integral with the forward sole." (<u>Id.</u>) Thus, the specification describes typical athletic shoes with the rear sole "attached" to the upper, as a "one-piece structure" and "integral" with the forward sole. The specification then discusses two problems with the such athletic shoes: (1) outsole wear, especially in the heel, "thus requiring replacement of the entire shoe even though the bulk of the shoe is still in satisfactory condition"; and (2) midsole compression which causes the shoe to lose its cushioning effect, especially in the heel area. (<u>Id.</u>) The specification states that "[t]o date, there is nothing in the art to address the *combined problems* of midsole compression and outsole wear in athletic shoes, and these problems remain especially severe in the heel area of such shoes." (<u>Id.</u>) (emphasis added). The specification notes that "[b]y contrast with dress shoes, whose heels can be replaced at nominal cost over and over again, the heel area (midsole and outsole) of an athletic shoe cannot be." (<u>Id.</u>) The specification explains that there are other methods for replacing the entire outsole of a shoe, but those methods are impractical for athletic shoes. The specification further explains that there are other methods for detachable or rotatable rear soles for shoes with a relatively hard heel and outsole, such as dress shoes, including a "detachable rear sole that is secured to a heel of the shoe with a center screw that penetrates the bottom of the rear sole and which is screwed into the bottom of the heel of the shoe."

(Id.)  However, using a center screw would not work with the softer materials used for athletic shoes, and could result in gaps between the detachable and non-detachable elements of the shoe.  (Id.)

In addition, the Background notes that "there have been attempts to deal with heel-center midsole compression and/or to add spring to the user's gait by introducing various mechanical components into heel construction," but "never in *combination* with a rotating or removable rear sole."  (Id.) (emphasis added).  The Background also points out that another problem "is that athletic shoe purchasers cannot customize the cushioning or spring in the heel of the shoe" and that there are few options available if there is a need for the left and right rear soles to be of a different height and/or different cushioning or spring properties. (Id. at 23-24.)

The Summary of the Invention describes the invention as a shoe that "includes an upper, a forward sole attached to the upper, a heel support attached to the upper, and a rear sole detachably secured or rotatably mounted to the heel support and including at least one ground-engaging layer and a midsole attached to the ground-engaging layer, the midsole made of an elastomeric material that is more resilient than the ground-engaging layer."  (Id. at 24.) This summary thus describes parts of the shoe that are permanently "attached," such as the forward sole attached to the upper and the heal support attached to the upper, in contrast to the rear sole which is "detachably secured or rotatably mounted."  (Id.)  "In another aspect," the Summary describes the shoe as having "an upper, a forward sole attached to the upper, a

heel support attached to the upper and having at least one wall extending downwardly from the upper, the wall at least partially defining a recess, *a rear sole receivable in the recess of the heel support* and having at least one ground-engaging surface, and a graphite insert either supported within the recess of the heel support or by the wall of the heel support between the rear sole and a heel portion of the upper." (Id.)

The Description of the Preferred Embodiments sets out several possible embodiments for the invention. Each embodiment includes either a detachable or rotatable rear sole as described or as shown in the associated drawings. In the first embodiment, "[t]he forward sole and heel support are attached to the shoe upper in a conventional manner, typically by injection molding, stitching or gluing," while "[t]he rear sole is detachable from the heel support." (Id. at 25.) "This allows the user the ability to change rear soles entirely when either the sole is worn to a significant degree, or the user desires a different sole for desired performance characteristics for specific athletic endeavors or playing surfaces. The rear sole can also be rotatably mounted on the heel support. The rear sole can be rotated to a plurality of positions (although only four positions are possible in the FIG. 1A embodiment), with a means provided to allow the user to secure the rear sole at each desired position." (Id.)

> The ability to remove the rear sole serves several purposes. The user can rotate and/or invert the rear sole to relocate a worn section to a less critical area of the sole, and eventually replace the rear sole altogether when the sole is excessively worn. Additional longevity in wear may also be achieved by interchanging removable rear soles as between the right and left shoes, which typically exhibit opposite wear patterns. However, some users will prefer to change the rear soles not because of adverse wear patterns, but because of a desire for different performance

14

characteristics.   For example, it is contemplated that a person using this invention in a shoe marketed as a "cross-trainer" may desire one type of rear sole for one sport, such as basketball, and another type of rear sole for another, such as running.

(Id.)   Notably, after describing this first embodiment, the specification states that "[f]urther embodiments are disclosed that show the various ways of attaching the rear sole to the heel support in accordance with the invention.   The general features of the first embodiment, such as the shape of the rear sole and the material composition of the shoe elements, *will apply to all embodiments* unless otherwise noted."   (Id.) (emphasis added).   The specification further notes that "[w]hile the above discussion is directed toward a rear sole that rotates or separates in its entirety, it is specifically contemplated that the same benefits of this invention can be achieved if only a portion of the rear sole is rotatable or removable. . . . For example, this invention includes the embodiment whereby a portion of the rear sole, e.g., the center area, remains stationary while the periphery of the ground-engaging surface rotates and/or is detachable." (Id.)

Akeva points to language in the ninth embodiment which it says supports its position that the specification discloses a permanently attached and fixed rear sole.   The language states:   "The graphite insert also need not be used only in conjunction with a detachable rear sole, but can be used with permanently attached rear soles as well."   (Id. at 29.)   However, this statement comes after a discussion of the use of graphite inserts in detachable rear soles, and in the context of the discussion makes clear that the graphite inserts can be used with

permanently attached rotatable rear soles as well. Thus, as described in the ninth embodiment, the graphite insert does not have to be used with a detachable rear sole, but may also be used in conjunction with permanently attached but rotatable rear soles as well.

Akeva also points to language in the third embodiment that "[t]he means for securing the rear sole is not limited; alternatives can include any of the securing means described herein, or as used conventionally in analogous applications. Alternatives can, of course, include integral locking mechanisms all around the outer periphery of the heel, such as a plurality of resilient protrusions on the rear sole which engage a corresponding number of receiving apertures on an overhanging portion of the heel support. The existence of an overhanging portion may require the tongue to be made of a resilient material so that the rear sole can bend downwards and clear the overhanging portion during assembly or disassembly." (Id. at 26 (8:56-67).) Akeva points specifically to the language providing that the means for securing the rear sole are not limited and "can include any of the securing means described herein, or as used conventionally in analogous applications." (Id.) However, this language does not describe rear soles that are not removable or rotatable. Instead, the context clearly describes means of securing the removable or rotatable rear sole. Indeed, the description specifically describes Figure 8A, with numerical references to the various parts of the drawing, and that drawing reflects a removable rear sole. Thus, the reference to various "securing means" as "used conventionally in analogous applications" describes ways of securing the removable or

rotatable rear sole, and cannot reasonably be read to refer to non-removable, non-rotatable soles that are permanently affixed or attached.

Akeva also argues that the '126 patent has three independent claims, 1, 19, and 25, and that Claims 1 and 25 are sufficiently broadly worded to cover a shoe with a flexible plate including a rear sole that is not limited to detachable/rotatable embodiments. (Resp. Br. [Doc. #306] at 15-16.) Akeva also argues that limiting Claims 1 and 25 to detachable or rotatable soles would be inconsistent with other claims of the '126 patent, such as Claims 14 and 40, which are narrower. (Id.) Claim 14 is the shoe of Claim 1 "including means for detachably securing the rear sole below the heel region" and Claim 40 is the shoe of Claim 25, "including means for detachably securing the rear sole below the heel region." (Id. at 30-31.) As to both Claims 14 and 40, the claims specifically cover a detachable rear sole, which would not conflict with a reading of Claims 1 and 25 as covering both a detachable or permanently attached rotatable rear sole. Thus, the reading of the claims together does not support the conclusion that "rear sole secured" includes permanently affixed conventional rear soles, and there are no claim differentiation issues in this regard.

Finally, Akeva argues that Inventor Meschan's contemporaneous communications at the time of the filing and issuance of the '126 patent show that he intended to include the flexible plate embodiment with a conventional rear sole. (Resp. Br. [Doc. #300] at 21.) Extrinsic evidence, including expert and inventor testimony, dictionaries, and learned treatises, can be useful in shedding light on the relevant art, but is "less significant than the intrinsic

record in determining 'the legally operative meaning of claim language.'"   Phillips, 415 F.3d at 1317. "[U]ndue reliance on extrinsic evidence poses the risk that it will be used to change the meaning of claims in derogation of the indisputable public records consisting of the claims, the specification and the prosecution history, thereby undermining the public notice function of patents."   Id. at 1319 (internal quotation omitted); see also Ariad Pharmaceuticals, Inc. v. Eli Lilly and Co., 598 F.3d 1336, 1351 (Fed. Cir. 2010). (noting that the "hallmark of written description is disclosure.   Thus, 'possession as shown in the disclosure' is a more complete formulation.   Yet whatever the specific articulation, the test requires an objective inquiry into the four corners of the specification from the perspective of a person of ordinary skill in the art."); Howmedica Osteonics Corp. v. Wright Medical Technology, Inc., 540 F.3d 1337, 1346-47 (Fed. Cir. 2008) ("Whether an inventor's testimony is consistent with a broader or narrower claim scope, that testimony is still limited by the fact that an inventor understands the invention but may not understand the claims, which are typically drafted by the attorney prosecuting the patent application. As we have explained, it is not unusual for there to be a significant difference between what an inventor thinks his patented invention is and what the ultimate scope of the claims is after allowance by the PTO. . . . We hold that inventor testimony as to the inventor's subjective intent is irrelevant to the issue of claim construction." (internal quotation omitted)).

Ultimately, the Court construes the "rear sole secured" claim term in the '126 patent to mean "rear sole selectively or permanently fastened, but not permanently fixed into

position," in light of how a person of ordinary skill in the art would understand the term in the context in which it is used and in light of the specification. The problem to be solved, as described above, supports this construction. The '126 patent describes an invention or inventions to solve the combined problems of both midsole compression and outsole wear, with a focus on the problem of the rear sole wearing out before the rest of the shoe, requiring replacement of the entire shoe when the bulk of the shoe is still in satisfactory condition. This problem of the rear soles wearing out faster than the rest of the shoe is solved by rear soles that can be rotated or replaced, which may also be used in combination with a graphite insert.

In addition, the specification distinguishes other shoes or portions of the invention that are permanently and conventionally attached. For example, the specification notes the problems with ordinary athletic shoes, which are described as having a laminated sole attached to an upper as a "one-piece structure" with the "rear sole being integral with the forward sole." This description of a one-piece structure with an integral rear sole is in contrast to the disclosed invention. Likewise, even in describing the invention, the language in the embodiments describes the <u>forward</u> sole and heel recess/receiving area as attached to the shoes in a conventional manner, such as molding, stitching, or gluing; in contrast, the <u>rear</u> sole is not so described. Thus, the specification includes detailed descriptions of permanently attached, conventionally affixed components of a shoe when so intended (i.e., traditional athletic shoes

used to illustrate the problem to be addressed; or the forward sole and receiving heel area of the disclosed invention), but that language is not used to describe the rear soles.

Third, the description disparages alternatives that include a permanently attached, non-rotatable rear sole. For example, the description specifically disparages athletic shoes in which the laminated sole is attached to the upper as a one-piece structure, with the rear sole being integral with the forward sole. The specification notes that such shoes face a problem of pronounced outsole wear on the heel, requiring replacement of the entire shoe even if the rest of the shoe is in satisfactory. In addition, the description disparages other attempts to introduce mechanical components into heel construction, specifically by noting that these efforts were not "in combination with a rotating or removable rear sole."

Finally, the specification discloses only detachable and/or rotatable rear soles in the description and in the embodiment descriptions and drawings. Akeva notes that embodiments are simply examples and should not be used to limit the claim terms. It is certainly true that it is "not enough that the only embodiments, or all of the embodiments, contain a particular limitation." Thorner v. Sony Computer Entm't Am. LLC, 669 F.3d 1362, 1366 (Fed. Cir. 2012). However, as noted above, in this case, the specification summarizes the invention as "a rear sole detachably secured or rotatably mounted to the heel support" or "a rear sole receivable in the recess of the heel support," and the specification also describes the first embodiment where "[t]he rear sole is detachable from the heel support" or where "[t]he rear sole can be rotatably mounted on the heel support." Most notably, the

specification also includes the following language: "[t]he general features of the first embodiment, such as the shape of the rear sole and the material composition of the shoe elements, will apply to all embodiments unless otherwise noted." Thus, by its express terms, the specification describes the invention and the first embodiment as covering rotatable and/or detachable rear soles, and disclaims all embodiments other than as set out in the first embodiment "unless otherwise noted." As discussed above, none of the other embodiments "otherwise note" by description or drawing a non-detachable, non-rotatable sole.

The Federal Circuit has repeatedly held that "[w]here the specification makes clear that the invention does not include a particular feature, that feature is deemed to be outside the reach of the claims of the patent, even though the language of the claims, read without reference to the specification, might be considered broad enough to encompass the feature in question." SciMed Life Sys., Inc., 242 F.3d at 1341; see also Openwave Sys., Inc. v. Apple Inc., 808 F.3d 509, 513 (Fed. Cir. 2015) (noting that disavowal can happen where the specification makes clear that the invention does not include a particular feature, and repeated derogatory statements about a particular embodiment reasonably may be viewed as a disavowal).

Thus, even absent consideration of the prior decision involving the '300 patent, the Court concludes that the "rear sole secured" claim terms of the '126 patent must be construed as set out above, in light of how a person of ordinary skill in the art would understand the claim language in the context of the specification, and in light of the language of the

specification which does not disclose and instead clearly disparages, distinguishes, and disavows non-detachable, non-rotatable rear soles.

Moreover, the Court further finds that this construction is consistent with the construction of "secured" given to the claim term of the '300 patent in the earlier litigation. In this regard, the Court does find that there is merit to construing the same claim terms similarly in related patents.  See NTP, Inc. v. Research In Motion, Ltd., 418 F.3d 1282, 1293 (Fed. Cir. 2005) ("Because NTP's patents all derive from the same parent application and share many common terms, we must interpret the claims consistently across all asserted patents."); Omega Eng'g, Inc. v. Rayteck Corp., 334 F3d. 1314 (Fed. Cir. 2003) ("The disputed term 'to outline' is the same throughout all five patents in the genealogy, including the '880 and '678 patents. The patentee made a clear and unmistakable disclaimer of claim scope in its prosecution of the parent '880 patent, and we presume, unless otherwise compelled, that the same claim term in the same patent or related patents carries the same construed meaning."). In the present case, not only are these two patents related, the '300 patent fully incorporated the '126 patent.  ('300 Patent [Doc. #292-6] at 1:10-13.)  Therefore, prior conclusions regarding the '300 patent further support the Court's conclusions regarding the '126 patent.

In the earlier litigation, this Court considered a similar dispute regarding the '300 patent. In that case, the parties disagreed "whether the 'spirit' of the invention should be the flexible plate, as [Akeva] contends, or the removability and rotatability of the heel, as [Adidas] argues." Akeva, 2005 WL 6225278.  The Court considered the specification of the '300 patent,

including the problems that the invention was designed to address, the description of the invention, language providing that "[i]n all embodiments, the invention includes mechanical means for selectively locking the rear sole relative to the rear sole support and upper of the shoe," and the description of the manner for connecting a rear sole to a rear sole support. Ultimately, the Court construed the '300 patent's claim terms' reference to a rear sole "secured" to mean "a rear sole selectively or permanently fastened, but not permanently fixed in position." Akeva, 2005 WL 6225278. Like the '126 patent in the present case, the specification of the '300 patent included language that provided that "[t]he flexible region also need not be used only in conjunction with a detachable rear sole, but can be used with permanently attached rear soles as well." Id. The Court concluded that "[t]his statement excludes only the detachability feature, one which the court does not read into the claim term, and does not address the movability of the rear sole." Id. This Court in the present case likewise concludes that the similar language in the '126 patent similarly refers to a rotatable heel that is not removable.

As discussed above, on appeal in the prior litigation, the Federal Circuit found that the '300 patent "discloses athletic shoes with extended life by improving the rear sole such that the rear sole is rotatable, detachable, or both." Akeva, 208 F. App'x at 864. The Federal Circuit concluded that "one skilled in the art reading the specification of the '300 patent specification would understand the term 'secured' as used in the '300 patent to mean shoes with rear soles that are secured to the shoe, but not permanently fixed." Id. at 865. This

23

Court reaches the same conclusion with respect to the same claim terms in the '126 patent, and the prior determination regarding the '300 patent further supports the Court's conclusions in this case.

Finally, the Court notes that this conclusion is also supported by Akeva's own position regarding the '126 patent in the prior suit. Specifically, in the prior suit, according to the Federal Circuit's decision in that case, Akeva argued that the '126 patent "claims a 'detachably secured' rear sole, and a rear sole that allows for 'selective rotation' and that this supports its claim that such soles are not the claimed invention of the '300." Akeva, 208 F. App'x at 864-65. The Federal Circuit concluded that the '300 patent was narrower than Akeva alleged, and in light of that history and the analysis set out above, there is no basis to now conclude that the '126 patent is broader than what Akeva argued in the prior case.

Having so concluded, the Court notes that the Parties agree that none of the allegedly infringing shoes in the present case have a detachable or rotatable rear sole, or a sole that is not permanently fixed in position. Therefore, based on the claim construction set out above, the Counterclaim Defendants would be entitled to judgment as a matter of law of non-infringement as to the '126 patent. The Court therefore need not proceed with claim construction as to any of the remaining disputed terms in the '126 patent.

D.     The Continuation Patents

The Continuation Patents (the '269 patent, the '130 patent, the '350 patent, and the '099 patent) are all descendants of the '126 patent and the '300 patent. In the '269 patent, the

disputed claim describes a shoe comprising "a rear sole below the heel region of the upper, the rear sole including a first layer of material that is at least in part ground-engaging and a second layer of material located at least in part above and in contact with the first layer of material." (Patent '269 [Doc. #292-2], Claim 1.) The claim also describes a "flexible plate . . . between at least a portion of the rear sole and at least a portion of the heel region of the upper," and "an opening in the rear sole." (Id.)

In the '130 patent, the challenged claims are Claim 6 and Claim 19, which both incorporate Claim 1. Claim 1 describes "a shoe comprising: a bottom; a major longitudinal axis; an upper; a sole including an outsole and a midsole, the sole being beneath at least a portion of the upper; a plate having an upper surface, a lower surface, an interior portion and peripheral portions . . . ; at least one opening in the shoe . . .;  and at least one rib . . . ."

The challenged claims in the '350 patent are based on Claim 14 describing "[a] shoe comprising:  an upper having a heel region; a rear sole permanently attached and non-rotatable below the heel region of the upper; a flexible plate having upper and lower surfaces and supported between at least a portion of the rear sole and at least a portion of the heel region of the upper . . . ; and at least one inflated cushion positioned beneath at least a portion of the flexible plate", as well as similar language regarding a rear sole "permanently attached and non-rotatable" in Claim 116, Claim 155, Claim 201, and Claim 239.

Finally, the challenged claims in the '099 patent also describe "[a]n assembly of footwear elements for use with an athletic shoe, the assembly comprising: an upper having an

25

arch region and a heel region; a supporting structure; a flexible plate . . . ; a heel support integral with the flexible plate . . . ; and an arch bridge . . . [and] wherein the rear sole is permanently attached and not rotatable."

Thus, at least two of the Continuation Patents include claim language explicitly covering rear soles that are permanently attached and not rotatable. However, the Court need not undertake further claim construction as to the Continuation Patents because the Court concludes that Defendants are entitled to summary judgment as to the Continuation Patents for the reasons set out below.

Each of the Continuation Patents is a continuation of the '300 patent construed in the prior litigation. "A continuation application claims the same invention claimed in an earlier application" and the application constitutes "one continuous application *for the continuing subject matter recited therein.*" Transco Prods. Inc. v. Performance Contracting, Inc., 38 F.3d 551, 555 (Fed. Cir. 1994) (emphasis in original) (quotation omitted).[2] In addition, each of the

---

2 The Federal Circuit further explained as follows:

[T]here are various types of "continuing" applications that one may file at the PTO. See The Manual of Patent Examining Procedure (MPEP), §§ 201.03–201.13 (1988); D. Chisum, Patents, § 13 (1985 rev.); P. Rosenberg, Patent Law Fundamentals, § 15.02[3] (1991). An applicant may file a continuation, divisional, or continuation-in-part (CIP) application of a prior application, all of which the PTO characterizes as "continuing" applications. See MPEP § 201.11. In general, a continuing application is one filed during the pendency of another application which contains at least part of the disclosure of the other application and names at least one inventor in common with that application.

"Continuation" and "divisional" applications are alike in that they are both continuing applications based on the same disclosure as an earlier application. They differ, however, in what they claim. A "continuation" application claims the same invention claimed in an earlier application, although there may be some variation in the scope of the subject matter claimed. See MPEP § 201.07. A "divisional" application, on the other hand, is one carved out of an earlier application which disclosed and claimed more than one independent invention, the result being that the divisional application claims only one or more, but not all, of the independent inventions of the earlier application. See MPEP § 201.06. A "CIP" application is a

Continuation Patents includes language incorporating the '300 patent by reference, and where prior patents are incorporated by reference, "[t]he incorporated patents are 'effectively part of the host [patents] as if [they] were explicitly contained therein.' . . . As a result, the disclaimers of the incorporated patents are part of the asserted patents." X2Y Attenuators, LLC v. International Trade Comm'n, 757 F.3d 1358, 1362-63 (Fed. Cir. 2014) (quoting Telemac Cellular Corp. v. Topp Telecom, Inc., 247 F.3d 1316, 1329 (Fed. Cir. 2001) (some internal citations omitted); see also Trustees of Boston Univ. v. Everlight Elecs. Co., Ltd., 23 F. Supp. 3d 50, 63 (D. Mass. May 20, 2014) ("Because the inventor limited the scope of the term for a parent application from which the patent-at-issue is a continuation, the limitation applies with equal force to the [continuation] patent."); Cordis Corp. v. Boston Scientific Corp., 658 F.3d 1347, 1356 n.5 (Fed. Cir. 2011) ("[A] disclaimer in the parent application carries forward into the construction of the same claim term in the child.") Thus, under this general principle, the disclaimer of scope found in the prior Akeva litigation would apply to the Continuation Patents.

---

continuing application containing a portion or all of the disclosure of an earlier application together with added matter not present in that earlier application. See MPEP § 201.08.4 The term "parent" is often used to refer to the immediately preceding application upon which a continuing application claims priority; the term "original" is used to refer to the first application in a chain of continuing applications. See MPEP §§ 201.04, 201.04(a).

The PTO has noted that the expressions "continuation," "divisional," and "continuation-in-part" are merely terms used for administrative convenience. See MPEP § 201.11. As explained more fully in section II.B. below, the bottom line is that, no matter what term is used to describe a continuing application, that application is entitled to the benefit of the filing date of an earlier application only as to common subject matter.

Transco, 38 F.3d at 555-56.

However, Akeva argues that for all of the asserted Continuation Patents, it rescinded the disclaimer found in the specification of the '300 patent in the prior litigation. Defendants dispute that this is legally possible, and argue that even if it were possible, Akeva's actions in the Patent Office did not successfully rescind the disclaimer. Defendants further argue that if the Court finds that Akeva successfully rescinded the disclaimer, the claims are invalid because (1) Akeva necessarily has added "new matter" to the patent causing the claims to be invalid under 35 U.S.C. § 132(a), (2) the asserted claims are invalid for failure to satisfy the written description requirement of 35 U.S.C. § 112, and (3) the asserted claims are invalid under 35 U.S.C. § 102(b) because the asserted claims would have priority dates in 2003 and 2004, and Nike sold accused shoes more than one year before those priority dates. (Supp. Br. [Doc. #305] at 8.)

In some instances, it is possible to rescind a disclaimer previously found in an earlier patent so that the continuation patents are not bound by the disclaimer. See Hakim v. Cannon Avent Grp., PLC, 479 F.3d 1313, 1318 (Fed. Cir. 2007) ("[A] disclaimer made during prosecution can be rescinded, permitting recapture of the disclaimed scope."); X2Y Attenuators, 757 F.3d at 1363 (noting that "incorporation by reference does not convert the invention of the incorporated patent into the invention of the host patent," and "it is certainly possible that a clear and unmistakable disavowal in an incorporated patent is no longer so when placed in the context of the disclosure of the host patent" (internal quotations omitted)). In the context of a prosecution disclaimer, to effectively rescind the disclaimer, "the

prosecution history must be sufficiently clear to inform the examiner that the previous disclaimer, and the prior art that it was made to avoid, may need to be revisited." Hakim, 479 F.3d at 1318; see also Luv N' Care, Ltd. v. Koninklijke Philips Elec. N.V., No. 2:11CV512, 2013 WL 3471269, at *6-10 (E.D. Tex. July 9, 2013).

Akeva relies upon the Declaration of Thomas Martin [Doc. #293-10] to show the steps that it took to attempt to rescind the disclaimer in the '300 patent. The Continuation Patents were filed in 2003 and 2004 In 2005 and 2006, Akeva amended the claims and modified the specifications in amendments submitted to the Patent and Trademark Office (PTO) with the intent of rescinding the disclaimer found in the '300 patent. Akeva "amended the specification to make it clear that the presently claimed invention is not limited to a rotatable or detachable rear sole." (Akeva Br. Att., e.g., Ex. F-2 at 14 [Doc. #293-15].) Akeva also filed Information Disclosure Statements ("IDS") with the PTO, attaching the opinions of the district court in this District in the prior litigation and advising the PTO that "the '300 patent is the subject of litigation in the United States District Court for the Middle District of North Carolina." (Id., e.g., Ex. F-3.) It drew the attention of the PTO to the term "secured," the term through which this Court found a disclaimer, and stated that "[i]t has been Applicant's intent, in this application and in prior applications, for the term 'secured' to have its ordinary meaning, i.e., fastened or attached." (Id., e.g., Ex. F-3 at 2.) The PTO issued a Notice of Allowance in which the examiner stated that "the following statement is considered to be necessary to clarify the meaning of the term 'secured' as used and understood by the Examiner

when allowing claims including this language. The Examiner has considered the Memorandum Opinion and Order of the North Carolina Court, and in allowing these claims has construed the term 'secured' in this pending application (as in the prior applications) to have its ordinary meaning." (Notice of Allowability, Ex. I [Doc. #306-9], at 3.)

However, rescinding a specification disclaimer would effectively broaden the scope of the Continuation Patents beyond that set out in the '300 patents. As discussed above, this Court previously found, and the Federal Circuit specifically concluded, that the '300 patent does not disclose, and clearly disclaims and disavows, rear soles that are not detachable, rotatable, or both. This Court will not revisit the prior determination regarding the '300 patent. Akeva nevertheless contends that the Continuation Patents could still claim priority based on the '126 patent, effectively "skipping" over the '300 patent back to the '126 patent. On this issue, the Parties have debated at length whether Akeva could rescind the disclaimers found in the '300 patent to reclaim alleged scope in an earlier grandparent, here the '126. However, it appears that this would effectively break the chain of priority with respect to subject matter that was disclaimed in the '300 patent, and would mean that the Continuation Patents involved "new matter" that could not claim the benefit of the earlier filing date and would face potential invalidity under 35 U.S.C. § 102 and § 103. Cf. Moy's Walker on Patents § 3:58 (noting that "by omitting parts of the parent application from the continuation, the inventor is taken as having allowed the aspects of the patenting transaction associated with the omitted parts to have ended. One consequence of this rule is that the presence of the omitted

subject matter in the parent application cannot be relied upon to support the adequate disclosure of any claims presented in the continuation.  Any attempts by the applicant to reintroduce the canceled subject matter back into the disclosure of the continuation are judged under the prohibition against new matter."); Anascape, Ltd. v. Nintendo of Am. Inc., 601 F.3d 1333, 1338–39 (holding that removing limitations in the description of a continuation patent resulted in inclusion of "new matter" not entitled to the priority date of the prior application); Hakim, 479 F.3d at 1317 (noting that if a patent applicant attempts to include broader claims in a continuation patent, "entitlement to an earlier filing date for any claimed subject matter may of course be necessary to avoid a statutory bar created by intervening events outlined in 35 U.S.C. §§ 102 and 103"); Hollmer v. Harari, 681 F.3d 1351, 1355–58 (Fed. Cir.2012) ("Thus, if any application in the priority chain fails to make the requisite disclosure of subject matter, the later-filed application is not entitled to the benefit of the filing date of applications preceding the break in the priority chain."); Zenon Envtl., Inc. v. U.S. Filter Corp., 506 F.3d 1370, 1379 (Fed. Cir.2007) (noting that to claim the benefit of an earlier ancestor, "continuity of disclosure must have been maintained throughout a chain of patents"); Lockwood v. American Airlines, Inc., 107 F.3d 1565, 1572 (Fed. Cir.1997) (holding that "[e]ach application in the chain must describe the claimed features" and that if "one of the intervening applications does not describe" the subject matter, the later application cannot claim the benefit of the earlier application).

Moreover, even if it were possible to skip over the '300 patent to reclaim scope in the '126 patent, as Akeva contends, the Court has considered the specification of the '126 patent at length as part of the claim construction set out above, and concluded that the '126 patent does not disclose, and clearly disclaims and disavows, rear soles that are non-detachable or non-rotatable. Thus, if Akeva successfully rescinded the specification disclaimer, it necessarily added "new matter" to the specifications of the Continuation Patents, and it cannot claim priority as to that new matter based on the '300 or '126 patents. See Anascape, Ltd., 601 F.3d at 1338 (applicant added "classical new matter" by removing limitation from parent application); Neutrino Dev. Corp. v. Sonosite, Inc., 423 F. Supp. 2d 673 (S.D. Tex. 2006) (granting summary judgment of invalidity based on new matter).

The Court does note that, ordinarily, the fact that the Patent Office has allowed an amendment without objection "is entitled to an especially weighty presumption of correctness" when the patent is later challenged based on the introduction of "new matter." Commonwealth Scientific & Indus. Research Org. v. Buffalo Tech., Inc., 542 F.3d 1363, 1380 (Fed. Cir. 2008). In the particular circumstances of the asserted patents of this case, however, the Court notes that the examiner allowed the amendments and did not consider them "new matter" because she "construed the term 'secured' in [the Continuation Patent application] (as in the prior applications) to have its ordinary meaning." (Notice of Allowability [Doc. #306-9], at 3.) This same examiner was the primary examiner on the prior application for the '300 patent and each of the asserted Continuation Patents, which means that her construction of

'secured,' at least for the '300 patent, is directly at odds with the construction given that term by this Court and the Federal Circuit in the previous <u>Akeva</u> litigation. As discussed above, in the prior litigation, the Court specifically concluded that "secured" was not construed to have its ordinary meaning. Either the examiner did not understand that from the information Akeva provided, or nevertheless continued with a contrary determination. Given the direct conflict between the examiner's determination and reasoning and the prior holdings of this Court and the Federal Circuit on this issue, the presumption of correctness to the Patent Office's decision to allow the amendments at issue is inapposite in the particular circumstances of this case.

E.      Summary Judgment Analysis

Defendants move for summary judgment pursuant to Federal Rule of Civil Procedure 56 against Akeva as to each of the five patents and 30 claims that Akeva asserted against them in this action. (Motion [Doc. #298] at 2.) Akeva has admitted that all of Defendants' accused shoes have traditional, permanently fixed rear soles. (Doc. #130, #187, #193 at Countercl. ¶¶ 21-22 (Nike); Doc. #186, #192 at Countercl. ¶¶ 18-19 (Adidas).

Summary judgment is appropriate only when no genuine issue of material fact exists. <u>Shealy v. Winston</u>, 929 F.2d 1009, 1011 (4th Cir. 1991). A genuine issue of fact exists if the evidence presented could lead a reasonable fact-finder to return a verdict in favor of the non-moving party. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986). A court considering a motion for summary judgment must view all facts and draw all reasonable

inferences from the evidence before it in a light most favorable to the non-moving party. <u>Id.</u> The proponent of summary judgment "bears the initial burden of pointing to the absence of a genuine issue of material fact." <u>Temkin v. Frederick Cnty. Comm'rs</u>, 945 F.2d 716, 718 (4th Cir. 1991) (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986)). If the movant carries this burden, then the burden "shifts to the non-moving party to come forward with facts sufficient to create a triable issue of fact." (<u>Id.</u> at 718-19 (citing <u>Anderson</u>, 477 U.S. at 247-48).) A mere scintilla of evidence supporting the non-moving party's case is insufficient to defeat a motion for summary judgment. <u>See, e.g.</u>, <u>Shaw v. Stroud</u>, 13 F.3d 791, 798 (4th Cir. 1994); <u>see also</u> <u>Anderson</u>, 477 U.S. at 248 (non-moving party may not rest upon mere allegations or denials.) In patent cases, "[w]here the parties do not dispute any relevant facts regarding the accused product, . . . but disagree over possible claim interpretations, the question of literal infringement collapses into claim construction and is amenable to summary judgment." <u>General Mills, Inc. v. Hunt-Wesson, Inc.</u>, 103 F.3d 978, 983 (Fed. Cir. 1997).

In the present case, the Court's claim construction determinations drive the summary judgment analysis. The Court has determined that the term "rear sole secured" in the '126 patent should be construed to mean "rear sole selectively or permanently fastened, but not permanently fixed into position," in light of how a person of ordinary skill in the art would understand the term in the context in which it is used and in light of the specification, and would not include shoes with rear soles that are permanently attached and non-rotatable. As noted above, Akeva has conceded that all of the allegedly infringing products of Defendants

have permanently attached and non-rotatable rear soles. Therefore, summary judgment is appropriate in favor of Defendants as to Akeva's claims that Defendants have infringed its '126 patent.

As to the asserted Continuation Patents (the '130, '269, '350, and '099 patents), the Court concludes that there are no genuine issues of material fact in light of the analysis set out above. The specification of the '126 patent cannot reasonably be read to describe an invention that includes non-detachable, non-rotatable rear soles, and no reasonable jury could find that a person of ordinary skill in the art could conclude that the '126 patent discloses non-detachable, non-rotatable rear soles. Akeva admitted during this Court's prior motion hearing that if the specification of the '126 patent is limited to detachable or rotatable soles and excluding conventional soles, it would "have a hard time coming up with disclosure to support the claims of the Continuation Patents." (Tr. of Hearing [Doc. #306-1], at 51.) In the supplemental briefing, Akeva acknowledged that "if the '126 Patent does not have written description support to cover conventional rear soles, then either the Continuation Patents cannot claim priority back to the '126 Patent, or the Continuation Patents themselves would not have written description support for conventional rear soles." (Supp. Resp. [Doc. #306].) Finally, it is undisputed that Nike sold allegedly infringing shoes with non-detachable, non-rotatable rear soles more than one year prior to the 2003 and 2004 applications for the Continuation Patents. Thus, because the Continuation Patents cannot claim priority based on the '300 or '126 patents for conventional, non-detachable, non-rotatable rear soles, the

Continuation Patents are invalid under 35 U.S.C. § 102 to the extent that they purport to include shoes with conventional, non-detachable, non-rotatable rear soles. See 35 U.S.C. § 102; Vanmoor v. Wal-Mart Stores, Inc., 201 F.3d 1363, 1366 (Fed. Cir. 2000); Evans Cooling Sys., Inc. v. Gen. Motors Corp., 125 F.3d 1448, 1451 (Fed. Cir. 1997). As noted above, Akeva has conceded that all of the allegedly infringing products of Defendants have permanently attached and non-rotatable rear soles, so there is no basis on which a jury could find that Defendants' products infringe any valid claims. Thus, Defendants are entitled to summary judgment as to all of Akeva's claims in this case.

In light of this determination, the Court will recommend that Defendants' Motion for Summary Judgment be granted on Akeva's claims of patent infringement, and that Akeva's infringement claims be dismissed. Having reached this determination, the Court need not reach the additional issues and defenses raised by Defendants.

The Court notes that given the extended history of this case and the related patents, and given the Court's uncertainty regarding the status of the mediation and settlement discussions as to the remaining claims, the Court will extend the stay in this case for 30 days and will direct the remaining parties to confer with one another and with the mediator to determine whether any further mediation is worthwhile before preparing objections and any other appeals of the present Recommendation. The parties may request that the stay be extended to accommodate further mediation, but if no such request is filed, objections will be due on May 13, 2019, which is 14 days after the stay expires.

IT IS THEREFORE RECOMMENDED that with respect to the '126 patent, the term "rear sole secured" be construed to mean "rear sole selectively or permanently fastened, but not permanently fixed into position," which would not include conventional rear soles that do not either detach or rotate.

IT IS FURTHER RECOMMENDED that Defendants' Motion for Summary Judgment [Doc. #298] and Supplemental Motion for Summary Judgment [Doc. #304] be granted as to Akeva's infringement claims, and that Akeva's Third Amended Counterclaim for Patent Infringement be dismissed with prejudice.

IT IS ORDERED that the stay in this case is extended until April 28, 2019, and the remaining parties are directed to confer with one another and with the mediator to determine whether any further mediation is worthwhile before preparing objections and any other appeals of the present Recommendation. The parties may request that the stay be extended to accommodate further mediation, but if no such request is filed, objections will be due on May 13, 2019.

This, the 29th day of March, 2019.

/s/ Joi Elizabeth Peake
United States Magistrate Judge